**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 23-160-CJS**

**MICHELLE RATLIFF**
**BETTY TUCKER**                                                                    **PLAINTIFFS**


**v.**                              **MEMORANDUM OPINION AND ORDER**


**KENTUCKY JUSTICE AND PUBLIC SAFETY**
**CABINET – DEPARTMENT OF JUVENILE JUSTICE, et al.**        **DEFENDANTS**

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

The parties in this civil action have consented to the jurisdiction of the undersigned to conduct all proceedings, including entry of judgment, in accordance with 28 U.S.C. § 636(c).  (R. 7).  Through their Complaint, Plaintiffs Michelle Ratliff and Betty Tucker allege Kentucky Whistleblower Act, First Amendment retaliation, and tortious interference with a business relationship claims.  (R. 1-1).  They name as Defendants the Kentucky Justice and Public Safety Cabinet – Department of Juvenile Justice, R. David Kazee in his individual and official capacities, and Tera Beth Sweetland in her individual and official capacities.[1]  (*Id.*).  Defendants have moved for summary judgment on all of Plaintiffs' claims, which dispositive motion has been fully briefed.  (*See* R. 37; R. 38; R. 39).  For the following reasons, Defendants' Motion for Summary Judgment will be **granted in part** and **denied in part.**

---

[1] Defendant Sweetland's first name appears in the record with and without a hyphen.  (*Compare* R. 1-1 at Page ID 5, *with* R. 38-4 at Page ID 564).

## I.    BACKGROUND

The Court provides the following broad overview of the factual circumstances underlying this case; additional facts are discussed below within the context of Plaintiffs' specific claims.  To begin, the Campbell Regional Juvenile Detention Center ("Detention Center") located in Campbell County, Kentucky, is operated by the Department of Juvenile Justice ("DJJ") within the Kentucky Justice and Public Safety Cabinet.  (R. 1-1 at Page ID 6).

For relevant parts of 2023 (May through September), Defendant Sweetland was Assistant Superintendent at the Detention Center.  (R. 38-4 at Page ID 576-77).  In early 2023, Kraig McWhorter was Superintendent, but following some interim personnel action against him, he was terminated in June 2023 after showing up to work intoxicated.  (*See id.* at Page ID 589-90; R. 38-10; R. 38-3 at Page ID 448-49).  Sweetland reported to McWhorter while he was Superintendent.  After he was terminated, she reported to Defendant Kazee, who was a Division Director with the DJJ and had some responsibility for overseeing the activities of the Detention Center.  (*See* R. 38-4 at Page ID 591; R. 38-3 at Page ID 437-42).

Plaintiff Ratliff is a registered nurse ("RN"), who was hired in February 2023 through Worldwide Travel Staffing ("Worldwide") to provide services for and on behalf of the DJJ at the Detention Center.  (R. 1-1 at ¶ 10).  Ratliff's initial contract with Worldwide ran from February 20 to May 21, 2023, her second contract ran from May 22 to August 20, 2023, and her third contract ran from August 21 to November 20, 2023.  (R. 38-16 at Page ID 900).  Plaintiff Tucker is a licensed practical nurse ("LPN"), who was hired in May 2023 through Worldwide to provide services for and on behalf of the DJJ at the Detention Center.  (R. 1-1 at ¶ 11).  Tucker's first contract ran from May 1 to July 30, 2023 (R. 38-8), and she signed an agreement extending her assignment from August 3 through November 3, 2023 (R. 37-6; R. 38-8).  At the facility, both

women were trained by and reported to Nurse Administrator Deborah S. Curry. (*See* R. 38-2 at Page ID 369, 372, internal pp. 12, 24; *see also* R. 38-16 at Page ID 999 (Ratliff testifying about Curry: "She's my boss. She's who I'm taking orders from.")).

In spring 2023, concerns about DJJ Correctional Officer Neil Moorman's interactions with residents at the Detention Center began to surface.[2] In May, some of these concerns were brought to Sweetland's attention. (*See* R. 38-4 at Page ID 637-39). For example, Sweetland was informed in mid-May that Moorman was alleged to have kissed a resident. (*See id.* at Page ID 637-39, 648). Sweetland reported this incident to McWhorter (*id.* at Page ID 647); she then took roughly two weeks of a medical leave (*id*. at Page ID 584). When she returned at the end of May, Sweetland informed Kazee of the allegations against Moorman.

At that time, Sweetland was advised of another incident in which Moorman allegedly kissed a resident, so she contacted the Internal Investigations Board and Kazee, who asked that Sweetland contact the Kentucky State Police ("KSP") (*see id.* at Page ID 647-57; *see also* R. 38-3 at Page ID 469-71 (Kazee testifying as to timeline, including that he called Executive Director of Operation of Detention James Sweatt to inform Sweatt of Sweetland's concerns regarding Moorman); *see also* R. 38-19 at Page ID 1038, internal p. 5 (Sweatt testifying as to his position)). Sweetland reported both incidents to the KSP, which responded to investigate, and she provided videos to the KSP. (R. 38-4 at Page ID 655-57). Originally, the KSP asked that Moorman not be terminated right away, so that he could be arrested at work. (R. 38-3 at Page ID 470). However, when Moorman did not show up to work as expected, the DJJ mailed him a termination letter. (*Id.* at Page ID 478 (Kazee testifying that Moorman's letter was sent via FedEx)).

---

[2] Plaintiffs' Response to Defendants' Motion for Summary Judgment discusses (in more detail) the allegations against Moorman, and the actions various individuals took in response to those allegations. (*See* R. 38 at Page ID 315-19; *see also* R. 38-13 (email thread in which Ratliff forwarded concerns about staff behavior)).

In late July 2023, Ratliff and Tucker both met with the Federal Bureau of Investigation ("FBI") and KSP to report what they knew about Moorman and the handling of his situation. (*See, e.g.,* R. 38-21 (text suggesting meeting occurred July 27, 2023); R. 38-20 at Page ID 1085, 1116, 1118; R. 38-16 at Page ID 975; R. 38-18 at Page ID 1022; R. 38-18 at Page ID 1342). After Ratliff spoke with local media, an article about the Moorman situation was published on August 8, 2023. (*See, e.g.*, R. 38-18 at Page ID 1022; R. 38-23 (titled "Juvenile detention employee under investigation for alleged sexual acts with teen detainees")). Sweetland, Kazee, and Sweatt were all informed that the nursing staff had been in contact with the FBI (and that Ratliff had been in contact with the media) regarding the Moorman situation. (*See, e.g.*, R. 38-19 at Page ID 1048-49, internal pp. 48-49; R. 38-3 at Page ID 504). A little over a month after Plaintiffs met with the FBI and KSP (and after the news story was published), Plaintiffs were removed from the Detention Center. (*See, e.g.*, R. 38-2 at Page ID 405, internal p. 156).

On November 3, 2023, Plaintiffs filed suit against Defendants in Campbell Circuit Court, asserting claims under the Kentucky Whistleblower Act, *see* KRS § 61.102, (Count I), 42 U.S.C. § 1983 for First Amendment retaliation (Count II), and Kentucky law for tortious interference with a business relationship (Count III). (R. 1-1). Plaintiffs name as Defendants the Kentucky Justice and Public Safety Cabinet – Department of Juvenile Justice, Kazee in his individual and official capacities, and Sweetland in her individual and official capacities. (*Id.*). On November 20, 2023, Defendants removed the action from Campbell Circuit Court to this Court. (R. 1). Defendants then filed their Answer. (R. 4). Because the parties consented to the jurisdiction of the undersigned for all further proceedings, including trial (*see* R. 6), this matter was reassigned to the undersigned "to conduct all proceedings, including entry of judgment in accordance with 28 U.S.C. § 636(c)" (R. 7).

4

A Scheduling Order was then entered in this action, and the parties proceeded to participate in discovery. (*See, e.g.*, R. 9). The deadlines set by the Scheduling Order were amended several times (*see, e.g.*, R. 12; R. 21), and the deadline for the filing of dispositive motions was ultimately set for April 7, 2025 (R. 36). On that date, Defendants timely filed their Motion for Summary Judgment. (R. 37). Plaintiffs filed a Response (R. 38), and Defendants filed a Reply (R. 39). This matter stands submitted for review.

## II.   LEGAL STANDARD

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56. That Rule provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56, once the movant has met its burden, the burden shifts to the nonmovant to present "specific facts showing that there is a genuine issue for trial." *Arendale v. City of Memphis*, 519 F.3d 587, 593-94 (6th Cir. 2008) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

When ruling on motions for summary judgment, courts accept the nonmovant's evidence as true and draw all reasonable inferences in favor of the nonmovant. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, to survive summary judgment, the nonmovant cannot rely on "conjecture or conclusory accusations" but must instead be able to show sufficient probative evidence that would permit a finding in the nonmovant's favor on more than mere speculation, conjecture, or fantasy. *Arendale*, 519 F.3d at 605 (citing and quoting *Lewis v.*

5

*Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).  Conclusory assertions supported only by, for example, a plaintiff's own opinions cannot withstand a motion for summary judgment.  *Id.*

## III.    ANALYSIS

Through their Complaint, Plaintiffs bring claims under the Kentucky Whistleblower Act ("KWA"), 42 U.S.C. § 1983 for First Amendment retaliation, and Kentucky law for tortious interference with a business relationship.  (*See* R. 1-1).  Defendants move for summary judgment on all of Plaintiffs' claims.  (R. 37).  The Court addresses Plaintiffs' federal claim(s) first.  *Cf. Williams v. Addison Cmty. Schs.*, --- F.4th ----, No. 25-1205, 2026 WL 575854, at *3 (6th Cir. Mar. 2, 2026) (discussing the exercise of supplemental jurisdiction in federal court).

### A.    First Amendment Retaliation[3]

To establish liability under 42 U.S.C. § 1983, a plaintiff must demonstrate that: (1) she was deprived of a right secured by the Constitution or laws of the United States, and (2) she was subjected or caused to be subjected to this deprivation by a person acting under color of state law. *Gregory v. Shelby Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000).  In this case, Plaintiffs allege they were retaliated against in violation of the First Amendment.

To prevail on a First Amendment retaliation theory, each Plaintiff must show that: "(1) she engaged in constitutionally protected speech, (2) she suffered an adverse action likely to chill a person of ordinary firmness from continuing to engage in protected speech, and (3) the protected speech was a substantial or motivating factor for the adverse action." *Kirkland v. City of Maryville*,

---

[3] The Court considers Plaintiffs' § 1983 claims as being only against Kazee and Sweetland in their individual capacities.  (*See* R. 1 (listing Kazee and Sweetland as Defendants in Count II); *see also* R. 37 (Defendants characterizing Plaintiffs' First Amendment claims as only being against Kazee and Sweetland)); *see also generally McAllister v. Kent State Univ.*, 454 F. Supp. 3d 709, 716-17 (N.D. Ohio 2020) (explaining that states are not "persons" under § 1983 and that state officials in their official capacities are not "persons" unless they are sued for injunctive relief)).  In doing so, the Court observes that Defendants have not argued they are entitled to qualified immunity.  (*See* R. 37; R. 39).

6

54 F.4th 901, 907 (6th Cir. 2022).[4]  As explained below, the Court concludes that Plaintiffs were

public employees.[5]  *See infra* § III.B; *see also Barber v. Louisville & Jefferson Cnty. Metro. Sewer*

*Dist.*, No. 3:05-cv-142-R, 2006 WL 3772209, at *4 (W.D. Ky. Dec. 20, 2006) ("Accordingly, the

Court finds that for purposes of his First Amendment and KWA claims, Barber was a public

employee with MSD.").  This characterization frames what Plaintiffs must show to establish their

First Amendment retaliation claims.

As a fundamental matter, the Supreme Court "has made clear that public employees do not

surrender all their First Amendment rights by reason of their employment."  *Garcetti v. Ceballos*,

547 U.S. 410, 417 (2006).  "Rather, the First Amendment protects a public employee's right, in

---

[4] Certain case law describes the inquiry in a First Amendment retaliation case as involving a burden-shifting framework.  For example, in *Dye v. Office of the Racing Commission*, the Sixth Circuit explained:

> First Amendment retaliation claims are analyzed under a burden-shifting framework.  A plaintiff must first make a prima facie case of retaliation, which comprises the following elements: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct."  If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate "by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct."  "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant."  Unlike in the *McDonnell Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims.

702 F.3d 286, 294-95 (6th Cir. 2012) (internal citations omitted).  However, other cases do not use the phrase "burden-shifting framework" when discussing First Amendment retaliation claims.  *See Summer v. Detroit Pub. Schs. Cmty. Dist.*, No. 24-1729, 2026 WL 637407, at *2-3 (6th Cir. Mar. 6, 2026).

[5] Indeed, Defendants characterize Plaintiffs as public employees for purposes of their First Amendment claims.  (*See* R. 37-1 at Page ID 128-29; *see also* R. 38 at Page ID 326 n.3, Page ID 332 n.4 (Plaintiffs pointing out incongruity in defense's argument that Plaintiffs were not public employees for their whistleblower claim, but were for their First Amendment claim)).

It is separately worth observing that "contractors can be considered state actors and face liability under § 1983."  *McCleary v. QCHC of Tennessee, PLLC*, No. 3:23-cv-385, 2025 WL 2796844, at *2 (E.D. Tenn. Sept. 26, 2025).

certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* The case law identifies two inquiries "to guide interpretation of the constitutional protections accorded to public employee speech." *Id.* at 418.

"The first requires determining whether the employee spoke as a citizen on a matter of public concern." *Id.* "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* "If the answer is yes, then the possibility of a First Amendment claim arises," and "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* "This consideration reflects the importance of the relationship between the speaker's expressions and employment." *Id.* "A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Id.*

Taken together, courts employ a three-step test when considering whether a public employee's speech is constitutionally protected. Under this test, an individual's speech will be considered constitutionally protected if: "(1) she was speaking as a private citizen and not pursuant to official duties, (2) her speech was on a matter of public concern, and (3) her speech interest outweighs the [state's] interest in 'promoting the efficiency of the public services it performs through its employees.'" *Kirkland*, 54 F.4th at 908; *see also Mayhew v. Town of Smyrna*, 856 F.3d 456, 463-64 (6th Cir. 2017) (considering this inquiry to be a question of law).

Applying this law to the present circumstances, the Court finds Plaintiffs were speaking as private citizens and not pursuant to official duties. Relevant here, Plaintiffs were medical employees who were tasked with providing medical care to residents at the Detention Center and

who were not tasked with overseeing the conduct of correctional officers.[6] *Cf. Garcetti*, 547 U.S. at 421 ("Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee."). Their speech, then, about the perceived mismanagement of the Moorman situation was *not* made pursuant to their official duties.

Similarly, the Court finds Plaintiffs were speaking on matters of public concern. In making this determination, the Court "look[s] to the content, form, and context" of Plaintiffs' statements, as revealed by the record as a whole. *Kirkland*, 54 F.4th at 908 (internal quotation marks omitted). "Issues of public concern include any matter of political, social, or other concern to the community," and "[q]uintessential examples include allegations of public corruption, mismanagement, or misconduct in government, as well as accusations of discrimination." *Id.* (internal quotation marks and citations omitted). By reporting issues of mismanagement and misconduct relating to the handling of the allegations against Moorman, Plaintiffs satisfy this element of their First Amendment claims. *See id.*

Additionally, the Court finds Plaintiffs' interest in speaking on these matters outweighed the state's interest to the contrary. *Id.* at 909. For this element, Kazee and Sweetland would prevail if they could show that the potential disruptiveness of Plaintiffs' speech was enough to outweigh whatever First Amendment value the speech might have had. *Id.* ("Although the burden is on the

---

[6] It may be that Plaintiffs were subject to mandatory reporting laws, but the parties do not argue the point. *See generally* KRS § 620.030. Further, even if Plaintiffs' reporting about Moorman himself was not protected speech, "[t]here is a critical difference between using the speech to criticize alleged government abuse and merely reporting an event when one is statutorily obligated to do so." *McAllister*, 454 F. Supp. 3d at 719 (addressing a First Amendment retaliation claim on a motion to dismiss).

9

City to demonstrate legitimate grounds for Kirkland's termination, we give 'substantial deference' to the City's 'reasonable view of its legitimate interests.'"). In support of their position that Plaintiffs' speech was disruptive, Defendants argue that "[a]ll information collected for use in juvenile court, including the records of the DJJ, are confidential under KRS 610.340" and that "[a]llowing employees and contractors to disclose confidential information regarding juveniles based on their own judgment without review by a court as required effectively nullifies the protections provided by KRS 610.240."[7] (R. 39 at Page ID 1358-59). However, Defendants fail to argue how Plaintiffs' release of information relating to *the handling of the Moorman situation* would constitute a "juvenile court record." For example, Defendants have not shown that Plaintiffs improperly released mental health records of a resident at the facility.[8] *See generally Ky. Prot. & Advoc. v. White*, No. 3:25-cv-00059-GFVT, 2026 WL 788685, at *1-6 (E.D. Ky. Mar. 20, 2026) (addressing motion for injunctive relief regarding release of *juveniles' confidential records*); *Mann v. Auto-Owners Ins. Co.*, No. 1:22-cv-25-GNS-HBB, 2024 WL 1323589, at *2 (W.D. Ky. Mar. 27, 2024) (noting the lack of case law interpreting KRS § 610.340, and discussing the limited authority applying that statute, including a case that addressed "juvenile and mental health records"). It is thus unclear how the statute relied upon by Defendants has any application to the present circumstances.

Turning then to the other elements of Plaintiffs' First Amendment retaliation claims, the Court considers whether they each suffered an adverse action likely to chill a person of ordinary firmness from continuing to engage in protected speech and whether the protected speech was a

---

[7] The Court assumes the defense's reference to KRS § 610.240 was a scrivener's error, as that statute has been repealed.

[8] Notably, Sweetland also provided copies of videos to the FBI and KSP, but Defendants have not argued that she violated any statutory provision by doing so.

substantial or motivating factor for the adverse action. *Kirkland*, 54 F.4th at 907. The parties do not thoroughly address these elements, instead focusing their attention on whether Plaintiffs' speech was constitutionally protected. (*See* R. 37-1 at Page ID 128-29; R. 38 at Page ID 332-34; R. 39 at Page ID 1357-59).

Even so, there is evidence in the record that Kazee was involved in the decision to have Plaintiffs removed from the facility, which would be an adverse employment action. *See Dye*, 702 F.3d at 303 ("The term 'adverse action' has traditionally referred to actions such as discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." (cleaned up)); (R. 38-24 at Page ID 1131 ("Executive Director James Sweatt in consultation with Defendant, then Division Director, David Kazee and Medical Director Dr. James Van Buren made the decision to not have Plaintiffs return to the facility.")). There is similarly evidence that Sweetland was involved in the decision for Ratliff to be removed. (*See, e.g.*, R. 38-16 at Page ID 1005-06).

Further, within this context, Defendants suggest Plaintiffs cannot support their First Amendment claims based on any orders from Sweetland and Kazee to other staff members to not communicate with Plaintiffs and Sweetland and Kazee preventing Plaintiffs from attending meetings. (R. 37-1 at Page ID 128-29). But this argument is underdeveloped, meaning it does not provide sufficient grounds for the Court to grant Defendants' summary judgment on Plaintiffs' First Amendment Claims. *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (cleaned up)).

Finally, as to causation, this circuit's "precedent holds that an adverse action motivated *in part* by protected speech violates the First Amendment[.]" *DeVooght v. City of Warren*, 157 F.4th

11

893, 903 (6th Cir. 2025) (discussing qualified immunity) (emphasis in original).  As discussed herein, the record taken in the light most favorable to Plaintiffs shows Kazee and Sweetland knew about Plaintiffs' speech and were involved in taking actions against Plaintiffs.  Such evidence is sufficient for the Plaintiffs' First Amendment retaliation claims to survive summary judgment.

Defendants' Motion for Summary Judgment as to Plaintiffs' First Amendment retaliation claims will therefore be **denied**.

### B.     Kentucky Whistleblower Act ("KWA")[9]

The KWA "protects state employees from reprisal for reporting actual or suspected agency violations of the law." *Davidson v. Com., Dep't of Mil. Affs.*, 152 S.W.3d 247, 249 (Ky. Ct. App. 2004).  Thus, "[t]he KWA serves the remedial purpose of protecting 'employees who possess knowledge of wrongdoing that is concealed or not publicly known, and who step forward to help uncover and disclose that information.'" *Harper v. Univ. of Louisville*, 559 S.W.3d 796, 801 (Ky. 2018) (quoting *Davidson*, 152 S.W.3d at 255).  Importantly, "[b]ecause the KWA serves the public purpose of identifying governmental wrongdoing, it must be liberally construed to serve that purpose." *Id.* (internal quotation marks omitted).

The basic framework for a KWA claim is statutory:

(1) No employer shall subject to reprisal, or directly or indirectly use, or threaten to use, any official authority or influence, in any manner whatsoever, which tends to discourage, restrain, depress, dissuade, deter, prevent, interfere with, coerce, or discriminate against any employee who in good faith reports, discloses, divulges, or otherwise brings to the attention of the Kentucky Legislative Ethics Commission, the Attorney General, the Auditor of Public Accounts, the Executive Branch Ethics Commission, the General Assembly of the Commonwealth of Kentucky or any of its members or employees, the Legislative Research Commission or any of its committees, members or employees, the judiciary or any member or employee of the judiciary, any law

---

[9] "[T]he language of KRS 61.101(2) does not impose individual civil liability under Kentucky's Whistleblower Act for reprisal against public employees of the Commonwealth and its political subdivisions." *Cabinet for Fams. & Child. v. Cummings*, 163 S.W.3d 425, 434 (Ky. 2005).  The Court therefore considers Plaintiffs' KWA claims to be only against the DJJ (as an arm of the Commonwealth).

12

enforcement agency or its employees, or any other appropriate body or authority, any facts or information relative to an actual or suspected violation of any law, statute, executive order, administrative regulation, mandate, rule, or ordinance of the United States, the Commonwealth of Kentucky, or any of its political subdivisions, or any facts or information relative to actual or suspected mismanagement, waste, fraud, abuse of authority, or a substantial and specific danger to public health or safety. No employer shall require any employee to give notice prior to making such a report, disclosure, or divulgence.

KRS § 61.102(1).

KRS § 61.103(1), in turn, defines "disclosure" as "a person acting on his own behalf, or on behalf of another, who reported or is about to report, either verbally or in writing, any matter set forth in KRS 61.102," and "contributing factor" as "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of a decision." Further, under the statute, "[i]t shall be presumed there existed a 'contributing factor' if the official taking the action knew or had constructive knowledge of the disclosure and acted within a limited period of time so that a reasonable person would conclude the disclosure was a factor in the personnel action." KRS § 61.103(1)(b). Finally, "KRS 61.103(3) contains a burden-shifting provision which provides that if the KWA plaintiff shows by a preponderance of evidence that the disclosure was a 'contributing factor in the [adverse] personnel action,' the 'burden of proof shall be on the agency to prove by clear and convincing evidence that the disclosure was not a material fact in the personnel action.'" *Harper*, 559 S.W.3d at 802.

All together:

[i]n order to demonstrate a violation of KRS 61.102, an employee must establish the following four elements: (1) the employer is an officer of the state; (2) the employee is employed by the state; (3) the employee made or attempted to make a good faith report or disclosure of a suspected violation of state or local law to an appropriate body or authority; and (4) the employer took action or threatened to take action to discourage the employee from making such a disclosure or to punish the employee for making such a disclosure. The employee must show by a preponderance of evidence that "the disclosure was a contributing factor in the personnel action." The burden of proof is then on the state employer "to prove by

13

clear and convincing evidence that the disclosure was not a material fact in the personnel action."

*Davidson*, 152 S.W.3d at 251 (internal footnotes omitted).

The Supreme Court of Kentucky has offered additional principles concerning KWA claims. "First, the 'disclosure' of information which is public information or otherwise already widely known within the organization cannot qualify as a whistleblower disclosure." *Harper*, 559 S.W.3d at 802. "The statute protects the whistleblower who exposes information not generally known." *Id.* "Second, complaints by an employee directly to her supervisor concerning the supervisor's own wrongful conduct generally cannot qualify as a whistleblower disclosure." *Id.* "Third, the disclosure must be made to one of the specific qualifying authorities identified within the statute, or to 'any other appropriate body or authority.'" *Id.* In this context, the list contained within the statute "is not limited to those with investigatory authority," but instead "encompasses those who may have authority to remedy or report perceived misconduct in a particular situation." *Id.* at 802-03 (internal quotation marks omitted). "Finally, the nature of the information disclosed cannot simply be an expression of a policy disagreement based upon the whistleblower's subjective opinion; it must objectively meet the criteria for the kinds of misconduct described in the KWA, such as actual or suspected conduct that violates a law or administrative regulation or conduct that objectively viewed constitutes waste or fraud." *Id.* at 803.

### 1 & 2.    Employer and Employee Elements

In their Motion for Summary Judgment, Defendants first argue that Plaintiffs were not employed by an officer of the Commonwealth and that their KWA claims therefore necessarily fail.[10] (R. 37-1 at Page ID 125-26).

---

[10] Because Defendants do not resist the conclusion that the DJJ is an arm of the state, the Court considers the first two elements of Plaintiffs' KWA claims together.

14

In this case, there was no formal employment of Plaintiffs by the DJJ. Defendants seize upon this fact in arguing Plaintiffs were not state employees. In support of their position, Defendants point to language from the contract between the Commonwealth and Worldwide:

> At no point shall any Contractor personnel be considered an employee of the Justice and Public Safety Cabinet, for any purpose, including but not limited to unemployment, taxes, withholding, health insurance, liability, retirement, workers' compensation, vacation, sick or other leave, the Family Medical Leave Act, accrued benefits, evaluations, or any other purpose. At all times, any such individual shall be considered and deemed to be an employee of the Contractor.

(*Id.* at Page ID 125 (quoting R. 37-2 at Page ID 142, ¶ 34)).[11]

However, the lack of a formal contract or agreement of employment of Plaintiffs by the DJJ is not dispositive of the question regarding Plaintiffs' employment status. Instead, the Court must consider whether the circumstances surrounding Plaintiffs' employment (though formally with Worldwide) demonstrate they met the statutory definition of "employee." KRS § 61.101(2) (defining "employee" as "a person in the service of the Commonwealth of Kentucky, or any of its political subdivisions, who is under contract of hire, express or implied, oral or written, where the Commonwealth, or any of its political subdivisions, has the power or right to control and direct the material details of work performance"); *see also Cummings*, 163 S.W.3d at 429-30.

In determining whether Plaintiffs were (or were not) state employees, several cases are instructive. Here, if the case law is viewed as presenting a spectrum for when individuals are (or are not) considered state employees, *Cummings,* 163 S.W.3d 425, sits at one end of the spectrum. As aptly summarized by the Kentucky Court of Appeals in another case: in *Cummings*, "the Supreme Court of Kentucky found that a university professor was an employee of the Cabinet for

---

[11] Defendants also point to language in Plaintiffs' contracts with Worldwide regarding a 45-day prohibition on employment by the Detention Center or another contractor at the same facility after the specific contract with Worldwide was completed or terminated. (R. 37-1 at Page ID 126; *see, e.g.*, R. 37-5 at ¶ 3.3).

15

Families and Children for purposes of the Whistleblower Act, even though there was no direct employment relationship or contract between the two." *White v. S. Health Partners, Inc.*, No. 2012-CA-001092-MR, 2013 WL 2659897, at *3 (Ky. Ct. App. June 14, 2013).

In reaching that decision, the *Cummings* court observed that the professor's proposal was expressly incorporated into the contract between the Cabinet and the university's institute, which made him "a person 'under contract of hire' with the Cabinet, a political subdivision of the Commonwealth of Kentucky." *Cummings*, 163 S.W.3d at 429. The court continued to explain that the professor could be considered an employee of the Cabinet if the Cabinet had the power or right to control and direct the material details of the professor's work experience and concluded:

> The record shows that the Cabinet had the right to control and did control the details of Cummings's work on the study. The Contract itself states that the Cabinet would provide the database with which Cummings was to work. The Cabinet was permitted to add additional recipients to "supplement under-reported categories" in the panel if necessary; work in conjunction with the Institute to determine the appropriate indicators to study; provide consultation and technical assistance to the Institute; and monitor all activities pursuant to the Contract. Cummings was to report his findings to the Cabinet regularly. In addition, the Cabinet had control over what information was presented to other state agencies, the public, the media, and the Legislature. Cummings's affidavit alleges that the Cabinet dictated the specific details of the manner in which he was to draw the samples, create certain questionnaires, and analyze and interpret the data. Cummings further contends that he was not permitted to use his professional expertise in any of the determinations made, and that this manner of control by the Cabinet was not usually seen in this type of situation. Cummings states that he met regularly with Cabinet officials in person and via e-mail, regarding the progress of the research, and that several of his reports were extensively re-written by the Cabinet. Cummings also states that the Cabinet used a detailed "Gantt chart," which specified certain time lines and work product deadlines Cummings was required to meet, as a tool to monitor the Institute's work on the study. The record also revealed copies of e-mails between Cummings and Cabinet employees where Cummings was specifically asked to remove the word "disparate" from his findings.
>
> Also telling is that the Cabinet had enough control over Cummings's work that it was ultimately able to remove him from the study altogether. The Act's prohibition on retaliatory firing necessarily implies that an employer must be in a position to retaliate with the threat of one's job. This is a type of situation that we believe the General Assembly envisioned and sought to protect when it enacted the Act.

16

*Id.* at 429-30.

If *Cummings* sits at one end of the spectrum, the Kentucky Court of Appeals' (unpublished) decision in *White* sits at the other. In that case, the court found nurses who were employed by a medical contractor for a county jail were *not* state employees. *White*, 2013 WL 2659897, at *3-4. The *White* court recognized that *Cummings* was instructive, but found the facts before it compelled a different result:

> By contrast [to *Cummings*], there is little evidence that Campbell County had any control over the specific, day-to-day aspects of White's and Stephens's work in providing medical services to inmates at the CCDC. The county did not have the power to direct the appellants to perform their tasks in a particular way, nor did it maintain the kind of substantive, detailed control and supervision over their duties that the Cabinet exercised over Cummings. Admittedly, the county did retain the right to ask SHP to remove employees with whom the county was dissatisfied, and the right to revoke the security clearance of SHP employees. But this power relates primarily to the vital security concerns associated with the jail setting, rather than to dissatisfaction with the professional performance of SHP employees. Again by contrast, in *Cummings,* there was evidence that the Cabinet was responsible for Cummings's termination from the study in direct retaliation for his plans to disclose negative findings about the effects of welfare reform. There is no evidence that the termination of White and Stephens was at the behest of the county at all, still less from any retaliatory motive on the part of the county for their work-related allegations. The county's power and control to direct the appellants' work performance was simply not sufficient to render the appellants 'employees' under the Whistleblower Act.

*Id.* at *4.

And if *Cummings* and *White* represent opposite ends of the spectrum, *Barber*, 2006 WL 3772209, at *1, sits close to *Cummings*. In that case, an individual, who was an employee of a contractor, began working as a construction inspector on projects for the Louisville and Jefferson County Metropolitan Sewer District ("MSD") through a contract that MSD had with the contractor. *Id.* Through his work, the plaintiff inspected sewer construction projects, where he received all direction from MSD supervisors, not his contractor. *Id.* Notably, the plaintiff was

17

trained by MSD on environmental requirements and procedures working on MSD sites, was responsible for bringing non-conformance to the attention of MSD, was assigned to specific projects by a MSD supervisor, and reported all problems to someone at MSD. *Id.*

When the plaintiff was fired after inquiring about and reporting alleged improper activities by others, he sued MSD, alleging KWA and First Amendment retaliation claims. *Id.* at *2. Upon review, the Western District of Kentucky concluded the plaintiff was a state employee for purposes of both of his claims:

> Here, similar to *Cummings,* Barber was to report his findings to MSD on a regular basis. In addition, MSD had control over what jobs Barber would be assigned to as well as his training. Further, Barber often communicated and met with MSD supervisors and personnel to discuss MSD projects. Barber received all of his job assignments from MSD. Ultimately, MSD had control over Barber to remove him from MSD operations altogether, by terminating the contract between Rangaswamy and MSD concerning Barber's job responsibilities.

*Id.* at *4.

Although on the surface, this case is reminiscent of *White* in that it involves medical professionals working for a detention facility, the Court finds Plaintiffs' employment circumstances are more like those in *Cummings* and *Barber* and less like those in *White*. For example, unlike *White*, Worldwide (through which Plaintiffs were employed) was not responsible for employing the entire medical staff at the Detention Center. *See White*, 2013 WL 2659897, at *1 ("Under the contract, SHP was responsible for employing the entire medical staff at the CCDC."). Indeed, evidence in the record shows Plaintiffs were trained by and reported to Curry, who was a state employee (*see* R. 38-2 at Page ID 369, 372, internal pp. 11-12, 24; *see also* R. 38-16 at Page ID 999 (Ratliff testifying about Curry: "She's my boss. She's who I'm taking orders from.")), and *Barber* instructs that training and control over individuals are significant considerations. And, it was Executive Director Sweatt's decision, in consultation with Kazee and

Dr. Van Buren, to remove Plaintiffs (R. 38-24 at Page ID 1131 ("Executive Director James Sweatt in consultation with Defendant, then Division Director, David Kazee and Medical Director Dr. James Van Buren made the decision to not have Plaintiffs return to the facility.")), and *Cummings* directs that the state's ability to remove an individual is a weighty factor in favor of finding an individual a state employee.  Moreover, the language of Plaintiffs' contracts with Worldwide stated they were employed subject to the supervision, and pursuant to the orders, advice, direction, and control of the Detention Center, and that any disputes regarding employment and/or termination would be settled between the individual and the Detention Center exclusive of the involvement of Worldwide.  (*See, e.g.*, R. 37-5 at Page ID 273, ¶ 2.2).

Therefore, the Court concludes that Plaintiffs were state employees for purposes of their KWA (and, above, First Amendment) retaliation claims.  *See Barber*, 2006 WL 3772209, at *4.

### 3.    Disclosure

Defendants next argue that the information provided by Plaintiffs to the FBI and KSP does not qualify as a "protected disclosure" within the meaning of the KWA.[12]  (R. 37-1 at Page ID 126).  As discussed above, as defined by statute, "'[d]isclosure' means a person acting on his own behalf, or on behalf of another, who reported or is about to report, either verbally or in writing, any matter set forth in KRS 61.102."  KRS § 61.103(1)(a).  And KRS § 61.102(1) lists the following matters as falling with its ambit: "any facts or information relative to an actual or suspected violation of any law, statute, executive order, administrative regulation, mandate, rule, or ordinance of the United States, the Commonwealth of Kentucky, or any of its political

---

[12] Defendants also argue that the information provided by Plaintiffs to the media is not a "disclosure" within the meaning of the KWA.  (R. 37-1 at Page ID 127).  On this point, Defendants are correct.  Indeed, in *Harper*, the Supreme Court of Kentucky concluded that newspapers and other media outlets could not be "reasonably classified" among the "specifically-identified bodies to whom whistleblower reports may be given."  *Harper*, 559 S.W.3d at 811.

subdivisions, or any facts or information relative to actual or suspected mismanagement, waste, fraud, abuse of authority, or a substantial and specific danger to public health or safety."

Defendants' "disclosure" argument is layered.  For instance, they submit that, "[w]hen Plaintiffs met with the FBI and Kentucky State Police, they knew that Moorman had been terminated from his employment with DJJ and that DJJ had referred the matter to the State Police to conduct a criminal investigation." (R. 37-1 at Page ID 126).  In Defendants' view, because this information was already widely known within the DJJ, it cannot qualify as a whistleblower disclosure. (*Id.* (citing *Harper*, 559 S.W.3d at 802)).

In their Response, Plaintiffs seem to credit Defendants' position that the allegations specifically regarding Moorman's misconduct were widely known at the time they spoke with the FBI and KSP, and they now frame their disclosure as focusing on the DJJ's handling of the Moorman situation:

> While the allegations regarding Moorman's misconduct may have been widely known when Plaintiffs spoke with the FBI and the Kentucky State Police, allegations that DJJ had mismanaged the Moorman situation were not widely known.
>
> When Plaintiffs reported suspected mismanagement of the Moorman situation to the FBI and Kentucky State Police in their July 27, 2023 meeting, IIB was still investigating the claims against Moorman.  At that time, there is simply no evidence that it was widely known outside of DJJ that Moorman was allowed to remain at CRJDC after evidence of his misconduct surfaced.

(R. 38 at Page ID 327-28).

To this, Defendants label Plaintiffs' disclosures as relating only to Moorman's conduct. (R. 39 at Page ID 1356-57 ("In deposition testimony, Plaintiffs suggested that the substance of the 'protected disclosures' to the FBI and Kentucky State Police was Moorman's criminal conduct itself.")).  However, the transcripts of Plaintiffs' depositions dispute this characterization.  For example, Tucker testified:

Q. Okay.  Did you have any discussion with anyone regarding management's response to the allegations of misconduct by Mr. Moorman?

A. Yes.  I did.

Q. Who?

A. The FBI when they questioned me about that.

Q. And that was when KSP was also present?

A. Yes.

(R. 38-20 at Page ID 1116).  She further testified:

Q. And, lastly, why do you believe you were removed from the Campbell Regional Juvenile Detention Center?

A. Because I was reporting what was going on, how the staff didn't respond to the events that occurred with Mr. Moorman and how the youth was treated.

(*Id.* at Page ID 1118).  Similarly, Ratliff testified that she contacted the FBI to report what had happened with Moorman and that she did not think it was being investigated.  (R. 38-16 at Page ID 975; *see also* 38-18 at Page ID 1022 ("On or about July 25, 2023, I met with FBI agent, Matt Calico, and KSP Officer, Joe Filatreau to discuss the misconduct within the CRJDC and management's failure to timely and/or adequately address the misconduct.  I was also aware that Calico was going to be speaking with Lt. Boswell and Betty Tucker.")).

Defendants then argue that, even if Plaintiffs did report mismanagement of the Moorman situation, the FBI and the KSP would not qualify as entities to whom whistleblower reports could have been given concerning the mismanagement allegations because they did not "possess the authority to review the decision-making process for actions the DJJ took or failed to take regarding Moorman's continued employment."  (*See* R. 39 at Page ID 1357).  This argument is perplexing though, as the text of KRS § 61.102(1) lists "any law enforcement agency or its employees" as an entity to which a whistleblower report may be given, and the FBI and KSP would seemingly have

21

authority to investigate whether the Moorman situation had been appropriately handled by the DJJ and the Detention Facility.

One final observation on this element of Plaintiffs' KWA claims. To the extent Defendants suggest that Plaintiffs were only voicing disagreement with how the situation was being managed and that such disagreement is not a protected disclosure, the case law supports an opposite finding. Indeed, in *Harper*, the Supreme Court of Kentucky clarified "any confusion regarding the protection afforded by the KWA to 'personal opinions'":

> KRS 61.102 protects disclosures of "actual," as well as, "suspected mismanagement, waste, fraud," etc. The phrase, "*suspected mismanagement, waste, fraud*," necessarily implicates an opinion of the putative whistleblower. To say that an employee *suspected* mismanagement or waste in a given activity means that the employee holds the *opinion* that the activity may be wasteful. The employer cannot defeat a whistleblower claim based upon suspected wasteful spending simply by recasting the suspicion as the employee's "personal opinion."

*Harper*, 559 S.W.3d at 806.

So too here Defendants cannot simply recast Plaintiffs' views that the Moorman situation had been mismanaged by the DJJ and/or the Detention Center as Plaintiffs' personal opinions in order to avoid the purview of the KWA. *See id.* at 803 ("Finally, the nature of the information disclosed cannot simply be an expression of a policy disagreement based upon the whistleblower's subjective opinion; it must objectively meet the criteria for the kinds of misconduct described in the KWA, such as actual or suspected conduct that violates a law or administrative regulation or conduct that objectively viewed constitutes waste or fraud."). Relevant here, Plaintiffs can point to objective facts, including that Moorman remained at the facility after his improper interactions with residents surfaced, that support the suggestion that the DJJ and/or Detention Center mismanaged concerns about Moorman. *See Kearney v. Univ. of Ky.*, 638 S.W.3d 385, 405 (Ky. 2022) (discussing *Harper* and the need for "objective fact[s] or information supporting the

22

suggestion of misconduct"). Having found the disclosure element satisfied, the Court considers the last element of Plaintiffs' KWA claims.

### 4. Contributing Factor

Finally, Defendants argue that the decisions to end Plaintiffs' services at the Detention Center were not punishment for their alleged protected disclosures. For this element, the Court again starts with the statutory text, which defines "contributing factor" as "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of a decision" and which directs that "[i]t shall be presumed there existed a 'contributing factor' if the official taking the action knew or had constructive knowledge of the disclosure and acted within a limited period of time so that a reasonable person would conclude the disclosure was a factor in the personnel action." KRS § 61.103(1)(b). The statute further provides that employees "shall show by a preponderance of evidence that the disclosure was a contributing factor in the personnel action," and that, "[o]nce a prima facie case of reprisal has been established and disclosure determined to be a contributing factor to the personnel action, the burden of proof shall be on the agency to prove by clear and convincing evidence that the disclosure was not a material fact in the personnel action." KRS § 61.103(3); *see also Davidson*, 152 S.W.3d at 249 ("The employee must show by a preponderance of evidence that the disclosure was a contributing factor in the personnel action. The burden of proof is then on the state employer to prove by clear and convincing evidence that the disclosure was not a material fact in the personnel action." (internal footnotes and quotation marks omitted)).

Plaintiffs were removed from the Detention Center just over a month after they met with the FBI and KSP at the end of July 2023. Tucker was removed on August 30, 2023, and Ratliff was removed on September 5, 2023. (R. 38-2 at Page ID 405, internal p. 156). They thus satisfy

the statutory presumption that the action was taken against them in a "limited period of time" following their protected disclosure(s). *See* KRS § 61.103(1)(b); *see also Harper*, 559 S.W.3d at 804 ("The elimination of Harper's position was announced immediately upon the heels of her last wasteful spending disclosure, and so, Harper enjoys the benefit of the statutory presumption."); *Erwin v. Just. & Pub. Safety Cabinet*, No. 2021-CA-0662-MR, 2022 WL 3129954, at *6 (Ky. Ct. App. Aug. 5, 2022) (finding 18-month gap between disclosure and termination in that case to not be a "limited period of time" under the KWA).

Next, the Court turns to whether Defendants have presented clear and convincing evidence that the disclosure was not a material fact in the personnel actions taken against Plaintiffs.[13] As to Tucker, Defendants argue "[t]he record is clear that Plaintiff Tucker was asked not to return to CRJDC because of issues with missing medication." (R. 37-1 at Page ID 127). However, Plaintiffs highlight that "Defendants have not produced evidence to suggest that dismissal is a typical response for alleged 'medication errors.'" (R. 38 at Page ID 330). Instead, as described by Plaintiffs, the defense provided 61 documented medication errors between March 22, 2023, and December 31, 2023, but the "DJJ did not identify a single nurse or medication liaison that was terminated or removed because of any alleged responsibility for a medication error." (*Id.*). That Tucker was supposedly removed for medication errors, when other nurses were not, prevents the DJJ from demonstrating clear and convincing evidence that her disclosure was *not* a material fact in the personnel action taken against her.[14]

---

[13] Plaintiffs argue the reasons offered for the removal were pretextual. (*See* R. 38 at Page ID 329-32). However, the case law cited by Plaintiffs do not involve claims under the KWA, making them of limited precedential value. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339 (6th Cir. 2012); *Gaglioti v. Levin Grp., Inc.*, 508 F. App'x 476 (6th Cir. 2012).

[14] Tucker's situation is also factually different from that presented in the case relied upon by Defendants, *see Davidson v. Louisville Metro. Gov't*, No. 3:19-cv-309-BJB, 2022 WL 19921239, at *7

24

As to Ratliff, the defense's arguments that her protected disclosure were not a material fact to her removal are weak. Defendants posit:

> The subsequent decision to ask that WWTS not return Plaintiff Ratliff to the facility was a decision by James Sweat[t] in which Dr. James Van Buren and Dave Kazee concurred, although they may have differed on the specific reason as to why that decision was wise. Any contention that it was retaliation for revealing a nefarious plan to coverup Neil Moorman['s] behavior is nonsensical because Moorman's conduct had been promptly referred for criminal investigation.

(R. 37-1 at Page ID 128; *see also* R. 37-1 at Page ID 124 ("This decision was a culmination of issues, most seriously the alleged back-dating of incident reports.")). Here, it is exactly the lack of a specific reason offered to support Ratliff's removal that leads the Court to conclude the DJJ has failed to carry its burden to show by clear and convincing evidence that the protected disclosure was not a material fact in the personnel action taken against Ratliff. (*See generally* R. 38 at Page ID 331-32 (Plaintiffs' Response addressing varied reasons offered by Defendants for Ratliff's removal); *see also* R. 38-16 at Page ID 1005 (Ratliff testifying that she had been told by Dr. Van Buren that Kazee and Sweetland were responsible for her removal)); *cf. Harper*, 559 S.W.3d at 804 ("The causation element of a KWA claim is satisfied if the jury believes that a qualifying disclosure was merely a 'contributing factor' in the adverse employment decision, meaning that causation is established if the disclosure, *in any way,* alone or in combination with other factors, advanced the adverse employment decision." (emphasis in original)).

For these reasons, Defendants' Motion for Summary Judgment on Plaintiffs' KWA claims will be denied.

---

(W.D. Ky. Aug. 17, 2022), where the record conclusively showed the plaintiff was fired for leaking confidential information to a third party, not in retaliation for any protected disclosures.

25

### C.      Tortious Interference with a Business Relationship[15]

Under Kentucky law, a claim for tortious interference with business relations requires: "(1) the existence of a valid business relationship or expectancy; (2) that the defendant was aware of this relationship or expectancy; (3) that the defendant intentionally interfered; (4) that the motive behind the interference was improper; (5) causation; and (6) special damages." *Halle v. Banner Indus. of N.E., Inc.*, 453 S.W.3d 179, 187 (Ky. Ct. App. 2014) (citing *Monumental Life Ins. Co. v. Nationwide Ret. Sols., Inc.*, 242 F. Supp. 2d 438, 450 (W.D. Ky. 2003)); *see also Rieck v. Hous. Auth. of Covington*, No. 22-5788, 2024 WL 556221, at *5 (6th Cir. Feb. 12, 2024) (citing *Halle*, 453 S.W.3d at 187).  On Plaintiffs' tortious interference claims in this case, the parties focus their disagreement on the third and fourth elements (concerning whether Defendants intentionally interfered in the business relationship between Plaintiffs and Worldwide and whether the motive behind the interference was improper).  (*See, e.g.*, R. 38 at Page ID 335 ("In opposition to Plaintiffs' tortious interference claims, Defendants argue that Plaintiffs cannot establish: (a) that Defendants intended to interfere with Plaintiffs' employment with WWTS; or (b) that any such interference was 'improper'.")).

In Plaintiffs' view, Defendants *intentionally* interfered and that interference was *improper*. However, Plaintiffs have not offered any definition, with citation to relevant authority, of what constitutes "interference."  Further, Plaintiffs have not explained (or provided evidence showing) what actions Defendants took to interfere (however defined under the law) with their business relationship(s) with Worldwide.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *see also* Interference, Black's

---

[15] Plaintiffs plead this cause of action as being against Sweetland and Kazee.  (*See* R. 1-1 at Count III).  Further, they describe their tortious interference claims as being "an alternative" to their KWA and First Amendment retaliation claims.  (R. 38 at Page ID 334).

Law Dictionary (12th ed. 2024) (defining interference as "[t]he act or process of obstructing normal operations or intervening or meddling in the affairs of others" or "[a]n obstruction or hindrance"); c*f. Alph C. Kaufman, Inc. v. Cornerstone Indus. Corp.*, 540 S.W.3d 803, 820 (Ky. Ct. App. 2017) ("In the case before us, Cornerstone presented evidence that Kaufman intentionally sought to lure Roby from Cornerstone to ACK, to take advantage of Roby's knowledge of Cornerstone's clients and potential clients, specifically to position ACK to compete with Cornerstone's business. There was also evidence that Roby and Kaufman purposefully conspired to misappropriate and divert business opportunities from Cornerstone to ACK.").

Plaintiffs argue that "[t]he evidence supports a finding that Kazee used his influence over Sweatt to facilitate the removal of Plaintiffs from CRJDC after he learned that Plaintiffs had been in contact with the FBI, the Kentucky State Police, and the local media" (R. 38 at Page ID 334), but this series of events does not even reference Worldwide.[16]   And Plaintiffs' argument that their removal "from CRJDC effectively ended their employment with WWTS" (*id.* at Page ID 335) is conclusory. Without evidence supporting any interference by Defendants, the Court need not reach the questions of whether any interference was "intentional" and/or "improper." *See McPherson*, 125 F.3d at 995-96 ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to

---

[16] In her deposition, Tucker was asked how Defendants tortiously interfered with her contract with Worldwide; she responded, "They told them I was involved in missing medications." (R. 38-20 at Page ID 1113). Similarly, Ratliff testified that Sweetland interfered with her Worldwide contract by removing her from the facility. (R. 38-16 at Page ID 984 (Ratliff testifying that she had been told that Kazee and Sweetland had her removed from the facility because they did not like Ratliff's "reporting")). Relatedly, *Defendants*' briefing contains various statements like: "The subsequent decision to ask that WWTS not return Plaintiff Ratliff to the facility was a decision by James Sweat[t] in which Dr. James Van Buren and Dave Kazee concurred . . . ."; and "To the extent that it could [be] said Kazee's acquiescence in the decision to ask Plaintiffs not to return to the facility could be considered conduct relevant to this claim, such conduct is entirely justified." (R. 37-1 at Page ID 130). But even considered together, these statements still leave open the questions of *who* told Worldwide *what* and *how* such actions "interfered" with Plaintiffs' relationship(s) with Worldwide.

27

mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (cleaned up)).

Defendants' Motion for Summary Judgment on Plaintiffs' tortious interference claims will therefore be granted.

## IV. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** as follows:

1) Defendants' Motion for Summary Judgment (R. 37) is hereby **granted in part** and **denied in part**.  Specifically, Defendants' Motion is **granted** as to Plaintiffs' tortious interference claims; the Motion is **denied** as to the Plaintiffs' First Amendment retaliation claims and Plaintiffs' KWA claims.

2) Within **thirty (30) days**, the same being not later than **April 30, 2026,** the parties shall file a joint status report that sets forth the anticipated length of trial, the dates of availability for trial through late 2026, and the parties' willingness to engage in alternative dispute resolution.

Signed this 31st day of March, 2026.



Signed By:

Candace J. Smith

United States Magistrate Judge

G:\Judge-CJS\DATA\Orders\civil cov\2023\23-160-CJS MOO GIP-DIP MSJ.docx